Citizens Mutual Investment Association v. Commissioner.
Citizens Mut. Inv. Assn. v. Commissioner
Docket No. 108572.
United States Tax Court
1943 Tax Ct. Memo LEXIS 287; 2 T.C.M. (CCH) 177; T.C.M. (RIA) 43257; May 25, 1943
*287 Ben F. Johnson, Esq., and J. B. Brennan, Esq., 1516 First Nat'l Bank Bldg., Atlanta, Ga., for the petitioner. J. Y. Porter, Esq., and Chas. P. Bagley, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case involves a deficiency in personal holding company surtax for the fiscal year ended March 31, 1938 of $4,546.86 and a 25 percent penalty of $1,136.72. Petitioner's personal holding company return was filed with the collector of internal revenue for the district of Georgia at Atlanta. The questions involved are the primary ones (1) whether petitioner was a personal holding company within the meaning of section 351, Revenue Act of 1936; (2) whether its failure to file a personal holding company return within the time prescribed by law was due to reasonable cause and not willful neglect; and (3) the amount of petitioner's adjusted net income, which depends upon the propriety of certain additions to reserves and certain deductions claimed. Some of the facts were stipulated by the parties, and in addition oral and documentary evidence was submitted at the hearing herein. Findings of Fact We find the facts to be as stipulated. That part of the stipulated *288 facts which will make apparent the questions presented together with the material facts established by the evidence, are as follows: Some years before 1935 the City Investment Co. was organized as a Georgia corporation for the purpose of engaging in the small loan business. In 1934 and until it discontinued making loans in January or February 1935, its stockholders were E. B. Zachry, his two brothers, a sister, and the estate of their mother, of which they were the sole beneficiaries. About that time the General Assembly of Georgia amended the small loan act, reducing the legal rate of interest on loans of $300 or less from 3 1/2 percent to 1 1/2 percent per month. Park's Annotated Code of Georgia (1933), title 25, ch. 25-3, section 25-313. Thereupon the Zachrys immediately caused the City Investment Co. to discontinue making loans and in April 1935 organized the petitioner, the Citizens Mutual Investment Association, as a general savings and loan institution and building and loan association under the provisions of title 16, ch. 16-1 of the Code of Georgia. At that time the Zachrys became and remained the sole owners of the entire outstanding paid-up capital A stock of the petitioner *289 corporation, and also its principal officers and directors. None of the corporation's Class A shares was ever offered to the public generally. For the fiscal year ended March 31, 1938, the petitioner's gross income, exclusive of the income adjustments in dispute in this proceeding, was $50,117.05. The source of said gross income was as follows: Interest
$19,835.53
Premiums
20,878.36
Fines
7,295.29
Insurance Commission
291.20
Bad Debt Recoverles
1,714.87
Dividends
1.80
$50,117.05
Upon organization, the petitioner purchased from the City Investment Co., for a total consideration of $67,464.86, certain of the latter's 3 1/2 percent per month borrower's notes having a face value of $73,339.74. The difference, $5,874.88, was debited on the vendor company's books to its reserve for notes and accounts doubtful of collection, and was credited on petitioner's books to a similar reserve after the latter's purchase of these notes. The City Investment Co. used, however, the specific bad debt deduction method in making its income tax returns for 1933, 1934 and 1935; and any reserves attempted to be taken by it as such were disallowed. In 1935 the petitioner also purchased but *290 at a 10 percent premium, amortized in full in prior years, certain borrowers' notes from the Fulton Loan Service having a face value of $5,857.96. These borrowers' notes which were purchased by the petitioner from the City Investment Co. and the Fulton Loan Service were in amounts approximately equal to those ordinarily handled by the petitioner in the usual course of its business and were made by borrowers of about the same type. Only a very few "real estate loans" were ever made by the petitioner, but in the taxable year ended March 31, 1938, slightly over 94 percent of its loans were "personal property loans" in amounts of $300 or less. At all times during its existence the petitioner, on its books and in its returns, employed the reserve method of deducting bad debts on all loans made by it. Additions to this reserve, which were deducted from income, were computed monthly on the basis of 2 percent of all new loans. For the taxable years ended March 31, 1936, 1937 and 1938, the petitioner added to its reserve for bad debts, and deducted in its income tax returns, the respective amounts of $5,081.14, $5,142.45 and $5,403.02. For these years and for its taxable periods ended March *291 31, 1939 and June 30, 1939, the petitioner charged against its reserve the following amounts representing bad debts on loans made by it: Year
Amount
March 31, 1936
$ 274.80
March 31, 1937
6,001.92
March 31, 1938
2,008.23
March 31, 1939
3,783.14
June 30, 1939 (Final return)
1,390.01
Total
$13,458.70 The petitioner also charged against this reserve bad debt losses on "purchased notes" as follows: Total
City
Fulton
Charge-
Investment
Loan
Year
Offs
Company
Service
March 31, 1936
$ 545.00
$ 545.00
March 31, 1937
2,579.55
2,496.98
$ 82.57
March 31, 1938
869.06
730.56
138.50
Of the foregoing charge-offs, the sum of $545.00, applicable to the year ended March 31, 1936, was not claimed by the petitioner as a specific bad debt deduction in its return for that year, but the similar charge-offs for the years ended March 31, 1937 and 1938 were so claimed. For the year ended March 31, 1939 and the period to June 30, 1939, the petitioner charged to its reserve, credited profit and loss, and reported in its returns as excess provision for doubtful notes, the amounts of $3,538.04 and $511.14, respectively. As of March 31, 1938, there existed in petitioner's *292 reserve for bad debts a credit balance of $9,222.93. Of this amount $7,341.66 constituted that part of the reserves set up against notes on loans made by petitioner, and $1,881.27 was the sum remaining of the original reserve set up on September 7, 1935 against notes purchased from the City Investment Co. and Fulton Loan Service. During the taxable periods beginning March 31, 1936 and ending June 30, 1939, the petitioner realized recoveries on bad debts, including an undeterminable amount received on notes purchased from the City Investment Co. and Fulton Loan Service as follows: Year
Amount
March 31, 1936
$ 3,005.83
March 31, 1937
3,729.74
March 31, 1938
1,714.87
March 31, 1939
1,275.52
June 30, 1939
429.26
Total
$10,155.22 None of these amounts was credited back to petitioner's bad debt reserve, but they were credited directly to profit and loss and were included as income in petitioner's returns in each of the years as above set forth. In the ordinary course of its business, when a customer would come into the petitioner's office to obtain, for example, a loan of $100, the following steps would be taken; numbered here for convenience: (1) Edmund B. Zachry, president *293 of petitioner, would state to the prospective borrower that the corporation was a mutual building and loan association and that before a loan could be made it would be necessary for the customer to become a member and to subscribe at least as much Class B stock, at $25.00 par per share, as would equal the face amount of the loan sought. He would also explain that the Class B stock for which the borrower must subscribe would be held as collateral by the company and that when the borrower's subscription was fully paid and his equivalent loan note should become due, the subscription payments would be applied in satisfaction of the note, thus concluding the entire transaction. (2) The borrower would then subscribe shares of Class B stock equal in face amount to the face amount of the loan sought. No one ever subscribed Class B shares except in order to secure a loan. (3) Immediately thereafter, the borrower would execute an "application and statement for loan". The information requested thereon was required primarily for the purpose of determining the borrower's credit standing. (4) If this application and statement for loan was found acceptable by the petitioner, the number of Class *294 B shares equal to the face amount of the loan sought would be issued by the petitioner in the borrower's name. If, however, the application and statement for loan was deemed by the petitioner to be unsatisfactory, no loan was made and the borrower's stock subscription agreement was immediately cancelled. (5) The petitioner would then require the borrower to assign to it the shares of Class B stock which had been made out in his name, by executing the two forms on the reverse side of the certificate. No loan was ever made by the petitioner unless the Class B shares subscribed by the borrower were immediately assigned to it in the manner above described. (6) As a part of the assignment above mentioned, the borrower agreed to make stated monthly payments on his Class B stock subscription agreement equal to one-twelfth of the face amount of the loan. In the example above stated such payments would equal $8.33 per month. The borrower also agreed to pay with each such monthly installment a "premium" computed on the basis of $1.00 per $100 of the face amount of the loan, for the "preferred privilege of making loans from the Corporation." In this assignment the borrower constituted the *295 president or the secretary of the corporation as his proxy to vote for him at all stockholders' meetings. (7) The borrower would then execute his note for $100, the full amount of the loan. Ordinarily, the petitioner also required collateral in the form of personal property and the signatures of co-makers or indorsers. (8) Upon satisfactory completion of these steps, the borrower in the foregoing example would receive $100, less 8 percent interest which was paid in advance, or $92 in cash. Thereafter, his installment repayments of this sum would be entered in a "participation record" which the petitioner furnished to all borrowers. (9) At the end of twelve months, when the borrower's stock subscription agreement, plus monthly premiums thereon, had been paid in full, and his loan note had become due, the petitioner would apply the subscription payments in satisfaction of the note and the Class B stock certificates which, as above stated, had been made out in the borrower's name, would thereupon be cancelled. In no case did a borrower ever pay up his loan note and actually receive and keep the Class B shares for which he had subscribed. Pursuant to the provisions of its charter *296 and by-laws, the petitioner was empowered, upon notice, to redeem its stock at par plus accrued dividends, after deducting the amount owed the petitioner by the stockholder on loans or other indebtedness; and the stockholder might, on like notice, withdraw the amounts he had paid in on his stock. In practice this power of redemption was used to apply the amount at any time paid on a borrower's Class B stock subscription agreement against an equal portion of the borrower's loan note. No Class B shares, however, were ever redeemed by petitioner at a greater amount than had been paid in on them. During the year 1938, the petitioner declared and paid in cash or credited to the subscription accounts of borrowers what were stated to be quarterly dividends on Class B stock. The amounts so paid, however, were determined individually for each share of so-called Class B stock on the basis of 4 percent per annum for the length of time that each subscription payment had been held by the petitioner at the so-called dividend date. During that year and for as long thereafter as it remained in existence, the petitioner declared and paid 7 percent dividends on its fully paid Class A stock which was *297 owned outright by the four Zachrys. In 1938 the General Assembly of Georgia amended the then existing law governing building and loan and other like associations. Title 16, ch. 16-4, section 16-402, Park's Annotated Code of Georgia (1933), (1941 Cumulative Supplemental Part, Acts of 1937-1938, p. 307-309). Thereupon, the Zachrys immediately caused the petitioner to discontinue making loans, but they themselves continued in the loan business, by means of a new corporation, the Citizens Loan and Security Co., which they caused to be organized under the Georgia law, as amended. No subscriber for "Class B stock" participated in the final liquidation of the petitioner corporation. When the petitioner corporation was dissolved and the Citizens Loan and Security Co. was organized, the Zachrys contemplated that the new company would make loans to petitioner's borrowers, thereby enabling them to satisfy their debts to the petitioner, and, if possible, to retain the same customers. Petitioner did not file a personal holding company return for the taxable year until July 8, 1940, because it did not consider itself a personal holding company and was so advised by its auditor and attorney in *298 both of whom it had confidence as persons qualified to advise it with regard to tax law, and both of whom were familiar with the facts concerning petitioner's business. Opinion KERN, Judge: 1. The first question is whether petitioner was a "personal holding company" within the meaning of section 352(a) 1 and 2 and section 353(a), Revenue Act of 1937, [1] which defined such a company as a corporation at least 80 per cent of whose gross income for the taxable year is dividends, interest, royalties (with exceptions), or annuities; and of whose outstanding stock at any time in the latter half of the year more than 50 per cent in value is owned by from one to five persons. The requirements are conjunctive. The petitioner has stipulated that its gross income for the fiscal year 1938 was $50,117.05; and that $19,835.53 of this represented "interest." In addition, petitioner received in the year $20,878.36 which it called "premiums," representing the total additional monthly payments of $1.00 for every $100 borrowed and which were required by petitioner of its borrowers for this "privilege." Since the acknowledged interest and the latter sum, if considered interest, would together constitute *299 more than 80 per cent of petitioner's gross income, the question is whether these so-called "premiums" are interest. We think that the "premiums" were undoubtedly "interest" *300 within the Act's scope. Federal, and not local, law must here control, since Congressional intent controls the law applicable, and it can scarcely be supposed that Congress could have intended in a revenue act to use a variable and not a uniform definition. Burnet v. Harmel, 287 U.S. 103, 110; United States v. Pelzer, 312 U.S. 399. The Treasury Regulations 94, Article 353-1 (2), as amended by Treasury Decision 4791, say: "The term 'interest' means any amounts includible in gross income, received for the use of money loaned." The "premiums" here were returned by the petitioner as income, and were clearly an integral part of the benefits flowing to the lender for money lent and they were paid by the borrower in order to obtain the money. The "premiums" had no relation to petitioner's expenses in connection with the particular loan, and were clearly interest. The whole question was fully considered by the Circuit Court of Appeals for the First Circuit in Hoteman v. Welch, 108 Fed. (2d) 206, at 213; and ruled against the taxpayer. We see nothing in the premiums involved here to distinguish *301 them from the charges there considered. Seaboard Loan & Savings Ass'n, Inc., 45 B.T.A. 510. Was more than 50 per cent of petitioner's stock in the latter half of the taxable year owned by 5 or fewer persons? The resolution of this question turns on the real status of the so-called "Class B" shares. All the "Class A" stock was owned by the three Zachry brothers, and one sister, it has been stipulated, and upon these 4,243 "Class A" shares, with a par value of $106,075, annual dividends of 7 per cent per annum were paid quarterly. Obviously, then, unless the "B" shares can be considered stock in reality and not merely in name, the statutory requisite of a personal holding company is present. A brief review of petitioner's origin throws light upon its nature and the nature of its borrower-stockholders ("Class B"). The petitioner's predecessor corporation, City Investment Co., also owned by the Zachry family, according to the testimony of Edmund B. Zachry, president of petitioner and one of the brothers, was a small-loan company which went out of business in 1935 when the Georgia legislature reduced the legal rate of interest on loans of $300 or less *302 from 3 1/2 to 1 1/2 per cent per month, or reckoned in more familiar terms, from 42 to 18 per cent per annum. What happened then? The petitioner was organized as a successor corporation to simulate a building and loan association, but the evidence is pretty clear that no loans customary to such an association were ever made. If a borrower came in to borrow $100, say, he was required to go through certain formal steps, without relevance to the real object of either lender or borrower but introduced merely to sustain the pretended purpose of the company, and the first of these was subscribing "Class B" "stock" equal to the face amount of his loan. He did not pay cash for this stock, but was required to pay each month a certain amount, the minimum payments of "borrowing members" being 1/12 the amount of their loan The stockholder then applied for his loan and this stock was assigned back to the company, as collateral security for the loan; and in practice, whatever the elaborate theory of "redemption," payments on the stock were applied against the borrower-stockholder's loan. In no case did a borrower ever pay in full his loan note and receive his Class "B" stock, and no "B" stockholder *303 participated in the final liquidation of petitioner. Let us now go back to the borrowerstockholder's application for a loan of $100 and trace the steps by which the relation was created. He executed a note for this amount but received in cash only $92, the remaining $8 having been deducted for annual interest in advance. In addition, he was required to pay a "premium," the nature of which we have already passed upon, of $1 every month for every $100 of the face amount of the loan. When we add the $8 acknowledged interest (paid in advance) and the $12 in "premium" interest claimed for the year, and then deduct the $1.85 socalled "dividends" paid by petitioner to the borrower-stockholder on his stock, we find that he paid the petitioner $18.15 interest for the use of an average amount (the loan being repaid monthly) of $46 for the year, or roughly 40 per cent per annum; a fairly close approximation of the 42 per cent taken by the predecessor corporation under the old law. The "dividend," it should be added, was not calculated on profits of the petitioner but (1) on the amount paid by the borrower-stockholder on his stock, and (2) on the period any such payment had been held by the *304 petitioner, and (3) at a rate of 4 per cent per annum. The "dividend" was, in other words, merely interest on the B stock subscription payments which was paid or credited to the borrower-stockholder, and constituted an insignificant rebate of the interest which he paid for the use of petitioner's money borrowed by him. It will be readily seen from this bare recital that the B stockholders had no real interest in the corporation and did not share in its profits. A "stockholder," says Bouvier (Rawle's 3rd revision) is "one who had property interests in the assets of a corporation and who is entitled to take part in its control and receive its dividends. Beal v. Bank, 67 Fed. 816, 15 C.C.A. 128. The word includes all members having a direct financial interest in the business of the corporation with power to participate in the profits and in the conduct of its affairs, though they hold no shares; Kimball v. Davis, 52 Mo. App. 194." In short, the stockholders are those who own the corporation and operate it for their own gain. Here, the B "stockholders" had no interest in the corporation and no power of control. We are of *305 the opinion that the borrowerstockholders here were not stockholders in the true sense of that word and consequently that petitioner falls in the statutory category of personal holding companies. We have had analogous questions arise in respect of the tax exemption claimed by building and loan associations and have held that merely nominal stockholders qualifying only formally as "members" to get loans were not truly stockholders. Guaranty State Savings & Loan Co., 14 B.T.A. 72, 77; cf. Fidelity Savings & Loan Co., 44 B.T.A. 471, 479. Adherence to realities requires us likewise to deny the claim here. However, since petitioner acted upon the advice of an auditor and an attorney in not filing a personal holding company return, and did not consider itself as such, and since the question is not so free from doubt as to cause us to consider this action on its part to be in bad faith, we are of the opinion that petitioner is not liable for a penalty under section 291, Revenue Act of 1936. Girard Investment Co. v. Commissioner, 122 Fed. (2d) 843; Dayton Bronze Co. v. Commissioner, 281 Fed. 709. *306 2. We turn now to certain adjustments in petitioner's taxable income. (a) Reserve for bad debts, 1938. Petitioner claims the deduction of an addition of $5,403.02 to a reserve set up by it for bad debts. Respondent has allowed only $2,529.98, which we consider more than adequate in the circumstances. Respondent has ably shown on brief that this is so, and without unnecessary elaboration, we shall here resume only briefly the arguments which support this conclusion. First, the petitioner used the reserve method in charging off bad debts on loans by regularly setting up every month a reserve equal to 2 per cent of the new loans made. Petitioner's president, Zachry, sought to show the necessity of the addition to the reserve during the taxable year by stating that the banks had taken the cream of this sort of business in 1935 and 1936, with consequently increasing difficulties for petitioner, and that large losses were to be expected on petitioner's liquidation. Neither of these claims is supported by the evidence, for as to the first, petitioner's recoveries of bad debts for 1936, 1937 and 1938 aggregated more than the losses on "regular accounts" (that is, on notes not bought *307 by petitioner); and the evidence still seems insufficient even though a proportion of these recoveries be considered as from bought notes. As to the second, since petitioner recovered almost half the deduction taken by it on those notes bought from its predecessor, the loss on these was not more than 4 per cent; and we cannot suppose that petitioner's successor, which looks to petitioner's customers for part of its own business, will be less successful; an assumption so reasonable in the circumstances that it cuts the foundation from petitioner's claim of an anticipated loss of 10 per cent. Finally, Zachry's contention that the petitioner's notes in 1938 were largely "renewals," and hence poor, is contradicted by other testimony. Respondent's computation, although it may have improperly taken into account later acquired knowledge, still does not reckon in bad debt recoveries; and we think is fair, all facts considered. On this issue we rule for respondent. (b) The next question is whether respondent properly included in petitioner's taxable income for 1938 the sum of $1,881.27, representing the remaining balance in its reserve for bad debts set up on its books for certain purchased *308 notes, after the losses thereon, including the $869.06 referred to below, had been charged against the reserve before the end of the fiscal year, March 31, 1938. Respondent's explanation for his determination with regard to this item is as follows: This represents the balance of the reserve for bad debts set up against purchased notes at March 31, 1938. All purchased accounts having been collected or charged off at March 31, 1938, the balance of the reserve should be restored to income. It will be remembered that the petitioner in September 1935 bought for $67,464.86 the City Investment Co's notes having a face value of $73,339.41, and the petitioner credited the difference of $5,874.88 to its "Reserve for notes and accounts doubtful of collection." Petitioner contends that this amount of $5,874.88 should have been treated not as a reserve but as a discount, and that 5874.88/7339.74 (or 8 per cent) of each of the purchased notes collected by it in full should have been treated as taxable income to it in the year in which collected. The evidence shows that petitioner itself treated this amount as a reserve, that it was set up as such upon its books, that notes deemed uncollectible *309 were charged against it, and that petitioner never returned a penny of income upon the theory that this amount was to be treated as a discount. Having treated the amount of $5,874.88 as a reserve for bad debts and having thus saved itself from the taxation which would have resulted if this amount had been treated as discount, the petitioner now, when the liquidation of its business calls for the inclusion in its income of the unexpended balance of this reserve, protests that it is not a reserve but has been all the time a discount. In our opinion this contention is unsound. Respondent is justified in treating this item in the taxable year, as petitioner has treated it in prior years to its own tax advantage, as a reserve. Alamo National Bank of San Antonio v. Commissioner, 95 Fed. (2d) 622. The unexpended balance of this reserve, $1,881.27, is properly includible in petitioner's income. Rossin & Sons, Inc. v. Commissioner, 113 Fed. (2d) 652. Regardless of whether the amount is treated as a reserve or a discount, the realities of the transaction are that petitioner has recovered its investment in the purchased notes *310 plus $1,881.27, and this latter amount should be treated as income. H. S. Crocker Co., Inc., 15 B.T.A. 175. (c) As to the question whether petitioner may deduct $869.06 as a specific bad debt in 1938, it can be quickly disposed of. The petitioner having elected the reserve system for its bad debts cannot now ask to have the specific bad debt system applied also. We therefore sustain the respondent here, also. Judgment will be entered under Rule 50. Footnotes
1. SEC. 352 (a) 1; 2 (1) GROSS INCOME REQUIREMENT. - At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 353; but if the corporation is a personal holding company with respect to any taxable year, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and (2) STOCK OWNERSHIP REQUIREMENT. - At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. SEC. 353. PERSONAL HOLDING COMPANY INCOME. (a) Dividends, interest, royalties (other than mineral, oil, or gas royalties), annuities.↩